In the Matter of DELAWARE & HUD-
SON RAILWAY COMPANY, a
Delaware corporation, Debtor.

Francis P. DICELLO, as Trustee, for
the Delaware and Hudson Railway
Company, Plaintiff,

v.

BOSTON AND MAINE CORPORATION,
and Maine Central Railroad
Company, Defendants.

Bankruptcy No. 88–342.
Adv. No. 90–42.

United States Bankruptcy Court,
D. Delaware.

May 7, 1991.

See also 124 B.R. 169.

Eduard F. von Wettberg, III, Joanne B. Wills, Wilmington, Del., Arthur B. Vieregg, Jr., Rodney H. Glover, B. Lee Willis, Washington, D.C., for trustee.

Jeffrey S. Goddess, Mark Minuti, Wilmington, Del., John H. Broadley, David A. Handzo, Julie M. Carpenter, Washington, D.C., for defendants.

HELEN S. BALICK, Bankruptcy Judge.

The Trustee of the Delaware & Hudson Railway Company (D & H) sued its related corporations the Boston and Maine Corporation (B & M) and the Maine Central Railroad Company (MeC) for the turnover of 5.5 million dollars collected by them for freight shipments carried by the D & H in the three months preceding its bankruptcy filing on June 20, 1988. The Trustee alleges that MeC and B & M in refusing to turnover these amounts are breaching a fiduciary duty and have violated the Code's automatic stay provisions. B & M and MeC admit that the amounts claimed are owed to the D & H, but they assert a right to set-off those amounts against debts they allege the D & H owes them. In lieu of trial, the parties submitted a joint stipulation of facts and conclusions of law.

Some preliminary fact findings are necessary to a resolution of the primary issue of whether the funds collected represent trust funds or whether the monies collected by B & M created a debtor-creditor relationship with the D & H.

Each of the three railroads are wholly-owned subsidiaries of Guilford Transporta-

tion Industries, Inc. Between January 4, 1984, when GTI acquired the D & H and June 17, 1988, the three roads had virtually identical boards of directors and substantially overlapping management. During this time, one or the other of the sister corporations acted as "collecting" carrier for "interline" shipments of freight that traveled over the D & H. Interline shipments are those that travel over more than one railroad and the "collecting" carrier here is either the originating railroad or the terminating railroad. The "collecting" carrier is responsible for paying the other railroads which participated in the movement their pro-rata share of shipping charges even if it fails to collect from a given customer. On the other hand, a connecting railroad must look solely to the collecting carrier for payment. It has no recourse against customers. The D & H was primarily a connecting carrier and derived most of its operating revenue from interline freight shipments.

Accounts among railroads for "interline" freight shipments are settled on a monthly basis. On or about the 12th working day of the month, the terminating carrier prepares an abstract which reflects the amount the "collecting" carrier owed to "connecting" carriers. After exchanging abstracts, the railroads compute what they owe each other for "interline" freight shipments. Only the net amount is paid and payment typically occurs on and after the 14th working day of the month. Payment is made in one of three ways—the draft system, bill and voucher system, and wire transfer.

On June 20, 1988, the B & M owed D & H interline freight amounts representing a portion of the service month of April and service months of May and June for a total of $4,581,812.70. For the service months of May and June, MeC owed for interline freight amounts $885,401.75. Sometime between June 20 and September 28, 1988, D & H submitted drafts in amounts less than that owed by each of its sister railroads for pre-petition interline payments which were declined. An officer of the B & M and MeC had told the Trustee's auditors that the pre-petition amounts would

not be paid but would be handled as an offset against the greater amounts the B & M and MeC allege the D & H owes them. Those amounts as stated in proofs of claim filed on behalf of each on September 1, 1989 are B & M's claim of $43,336,500.42, which includes $4,800,000 transferred by wire from B & M to D & H on February 4, 1988; and MeC's claim of $13,162,301.44, which includes six wire transfers during January 1988 totalling $2,200,000.

This brings us to discussion of whether the interline freight amounts paid by collecting carriers to B & M and MeC created a trustee relationship or debtor-creditor relationship.

### Turnover of Interline Funds

█ The law on turnover of interline railroad funds involving a railroad in reorganization is well-settled within this Circuit and is controlled by the Third Circuit's decision in *In re Penn Central Transportation Co.*, 486 F.2d 519 (3d Cir.1973) (*en banc*) *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). In *Penn Central*, the Court of Appeals sitting *en banc* held that interline "transportation and freight charges, *when collected*, are held in trust by the Interlines." 486 F.2d at 524 (emphasis in original). In determining whether the interline monies were trust funds or not, the court looked to the "manifestations of intent" reflected in "the facts and circumstances surrounding the transaction" as well as the "relationship of the parties." *Id.* at 524. The interline account in *Penn Central* was not subject to interest and, therefore, an indicia of a trust relationship. Moreover, though commingled funds normally suggest a debtor-creditor relationship, the *Penn Central* court underscored this factor stating that "[c]ommingling of monies has minimal significance in the extraordinary operations of interline railroads." *Id.* at 525. Finally, the court found that the relationship of the parties indicated a trust relationship in that the collecting railroad did apportion total charges with the interlines, the monies received by the interlines directly related to and was dependent upon the charges paid

by shippers, and the amounts owed to the interlines were payable immediately upon striking the monthly settlement. *Id.* at 527. In sum, the landmark *Penn Central* case views interline funds held by one railroad for the benefit of another as trust funds rather than a trade debt provided that there are sufficient indicia to support the implied-in-fact trust relationship. *Id. See also Missouri Pacific R.R. Co. v. Escanaba & Lake Superior R.R. Co.,* 702 F.Supp. 630, 633 (W.D.Mich.1988). The Third Circuit's holding in *Penn Central* is a matter of federal common law and not dependent on state law concepts. *In re Lehigh & New England Ry. Co.,* 657 F.2d 570 (3d Cir.1981).

Although the *Penn Central* decision relied on principles of trust law, the underlying public policy of the case sought to support "the congressional policy encouraging interline rail transportation of freight and passengers nationwide." 486 F.2d at 527. Similarly, the concurring opinion of Judge Adams emphasized the national interest in maintaining a viable interline system; in fact, he would have gone so far to hold that, regardless of any semblance of a trust, interline carriers were entitled to superior status over that of creditors of the collecting carrier. *Id.* at 533. Nevertheless, the majority in *Penn Central* did not enunciate such a prophylactic rule with respect to interline creditors, but required that indicia of trusts (with emphasis on interest not being paid and deemphasis on commingling of funds) be present in the interline arrangement. *See* Restatement (Second) of Trusts § 2 (1959). Thus, *Penn Central* concluded that a trustee-beneficiary relationship is implied where railroads collected fees for each other and balanced their accounts monthly without paying interest. 486 F.2d at 524. *Accord Chase v. Committee of Interline R.Rs. (In re Ann Arbor R.R. Co.),* 623 F.2d 480, 483 (6th Cir.1980). *Contra Union Pacific R.R. Co. v. Moritz (In re Iowa R.R. Co.),* 840 F.2d 535 (7th Cir.1988) (expressly rejecting both the *Penn Central* trust rationale and Judge Adams' concurrence).

This case is nearly on all fours with *Penn Central.* Here, the B & M and MeC

as collecting interlines did not pay the D & H interest on the interline amounts which, under *Penn Central's* analysis, is a key indicator of a trust relationship. As for the mode of payment, the D & H, MeC and B & M railroads were on the draft system with respect to non-GTI railroads around the time of the D & H's filing; moreover, the B & M and MeC utilized wire transfer to pay the D & H its interline freight amounts due up until the D & H bankruptcy in June of 1988. Occasionally, the B & M and MeC paid the D & H its interline amounts due in installments during the one year prior to the bankruptcy even though it often received lump sum payments from its sister railroads. Nevertheless, regardless of the fact that the interline monies were commingled, the settlement of funds test set forth in *Penn Central* is clearly met here. Specifically, the D & H did have an arrangement with the MeC and B & M to apportion charges, the amounts received by these collecting railroads were directly related to and dependent upon freight charges made for the interline movements, and the amounts owed were payable upon the monthly settlement. 486 F.2d at 527. Despite some intercompany liberality in payment terms accorded the B & M and MeC to the D & H, these trifles do not negate the main indicia of an implied trust with respect to the interline funds, especially given the insider status of the defendant railroads. *See* 11 U.S.C. § 101(30)(B)(i)–(iii). If anything, the intercorporate structure among these affiliated railroads enhances the collecting interlines' fiduciary duties with respect to the funds.

The B & M and MeC rely on the Seventh Circuit decision in *Iowa Railroad, supra,* for its contention that the interline accounts should be characterized as trade debts rather than funds held in trust. As signaled earlier in the citation of that case, *Iowa Railroad* and *Penn Central* are in conflict with one another. This court is bound by the Third Circuit's ruling in *Penn Central* and not by the cases of any other Circuit based on the principle of *stare decisis. See Norfolk & Western R.R. Co. v. Bergman (In re Bergman),* 103 B.R. 660,

668 (Bankr.E.D.Pa.1989). Only the U.S. Supreme Court or the Third Circuit sitting *en banc* could reverse the governing law on this issue for the courts in this Circuit.

Having found that the interline funds were held in trust, the court need not consider the breach of fiduciary duty contention nor the argument that a constructive or resulting trust on the interline monies should be imposed.

### Violation of the Automatic Stay

As to the Trustee's claim that the defendants violated the automatic stay provisions of 11 U.S.C. § 362, the court finds that their retention of the disputed funds to preserve the *status quo* pending a judicial determination of setoff did not violate the automatic stay. Generally, setoffs are disfavored in railroad reorganization cases absent exceptional circumstances justifying the setoff. *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974); *In re Reading Co.*, 838 F.2d 686 (3d Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2825, 100 L.Ed.2d 925 (1988). The B & M and MeC did not take affirmative steps to seize property of the estate but simply withheld payment on amounts owed to the D & H. *Cf. In re Clemmons*, 107 B.R. 488 (Bankr.D.Del. 1989). Such a freeze is usually not deemed to be an "act to obtain possession of property" or an "act to collect ... or recover a claim against the debtor" as prohibited by § 362(a)(3) and (a)(6), respectively. *See In re Edgins*, 36 B.R. 480, 484 (Bankr.App. 9th Cir.1984). In addition, there is a split among the Circuits on how interline funds should be treated in the context of railroad reorganizations. Consequently, there may have been a *bona fide* legal argument for treating the sum as ordinary debt. Still, the B & M and MeC had the use and benefit of the 5.5 million dollars for over six years, and the D & H is clearly entitled to prejudgment interest. *See, e.g., In re Bridge*, 106 B.R. 474 (Bankr.E.D.Mich. 1989). Accordingly, the Trustee is not entitled to punitive damages but is entitled to prejudgment interest at the federal rate based on the accrual dates stipulated to by the parties.

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, May 7, 1991, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT judgment is entered in favor of the Trustee against the Boston and Maine Corporation in the amount of $4,581,812.70 and against the Maine Central Railroad Company in the amount of $885,401.75, plus pre-judgment interest at the rate of 7.54% from July 21, 1988.