**In re KULZER ROOFING, INC., Debtor.**

**Bankruptcy No. 90–11525S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 10, 1992.

Kenneth E. Carobus, Morris, Adelman & Dickman, Philadelphia, Pa., trustee.

Sanford G. Rosenthal, Sagot, Jennings & Sigmond, Philadelphia, Pa., for Unions.

Rawle & Henderson, Philadelphia, Pa., for Debtor.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

In *Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), the Supreme Court held that 26 U.S.C. § 7501(a) of the Internal Revenue Code ("the IRC"), when aided by legislative history expressing such an intention, 110 S.Ct. at 2265–67, provides that any voluntary payments of "trust-fund taxes" by a debtor allow the federal government to evade the central bankruptcy policy of "[e]quality of distribution among creditors," *id.* 110 S.Ct. at 2262, and to retain those payments. In the instant contested matter, several labor unions seek to expand the concepts set forth in *Begier* to extend priority treatment to liabilities of a Debtor-former employer to certain Union Funds which are contractually "trust fund payments," even though the Debtor has not made the payments and the "trust funds" have not been traced to specific proceeds in the hands of the Debtor.

We conclude that, given the narrowness of the *Begier* holding, such an expansion of its principles would be unwarranted. Therefore, except as to sums segregated by the Trustee for the benefit of the Funds after the conversion of the case to Chapter 7, to which the Trustee has stipulated that the unions are entitled, the relief sought by the Unions must be denied.

### B. PROCEDURAL AND FACTUAL HISTORY

KULZER ROOFING, INC. ("the Debtor") filed a voluntary Chapter 11 bankruptcy case on April 5, 1990. After filing a Plan of Reorganization and a Disclosure Statement on October 1, 1990, the Debtor forewent an opportunity to file an Amended Disclosure Statement on or before November 15, 1990, and instead, on November 16, 1990, moved to voluntarily convert this case to a Chapter 7 case. On November 30, 1990, the conversion order was entered, and, on December 12, 1990, KENNETH E. CAROBUS, ESQUIRE ("the Trustee") was appointed.

The Trustee filed successive motions to continue the business operations of the Debtor, a roofing contractor, through on or about April 1, 1991, at which time the Debtor's operations ceased. After a status hearing of October 10, 1991, this court entered an Order of that date establishing November 22, 1991, as the bar date for filing all proofs of claim; August 3, 1992, as the date for the Trustee to file the final audit papers; and September 8, 1992, as the prospective date for a final audit hearing,

On January 16, 1992, Composition Roofers Local Union No. 30 ("Local 30"), Vacation Fund ("the Vacation Fund"); Composition Roofers Local Union No. 30 Political Action Fund ("the PA Fund"); and Composition Roofers Local Union No. 30 Home Association Fund ("the HA Fund"); and Composition Roofers Local Union No. 30 of the United Union of Roofers, Waterproofers and Allied Workers, as to its own fund ("the Union Fund") (collectively all of the Movants are referred to as "the Local 30

Funds"), filed the instant "Motion and Application" for Payment of Monies Held in Trust ("the Motion"). The Trustee answered and the Motion came before us on February 18, 1992. By agreement of the parties, we entered an Order of February 19, 1992, directing the parties to file a Stipulation of Facts which would constitute the record in this matter and Briefs in support of their respective positions on or before March 20, 1992.

Also worthy of mention is the institution of a related proceeding by the Trustee, at Adversary No. 92–0098S ("the Proceeding"), on January 30, 1992, to attempt to enjoin the prosecution of private criminal complaints filed by the Funds against the Debtor and its former President, William Kulzer, to recover the payments in issue. The Trustee alleged that the Funds were improperly trying to evade the bar date, which had apparently passed without the Union's having filed a proof of claim. We denied a motion for a preliminary injunction in the Proceeding on February 6, 1992, on the strength of *In re Davis*, 691 F.2d 176, 178–79 (3d Cir.1982). On the date of the final trial of the matter, April 2, 1992, the Trustee withdrew the Complaint. We are not aware of the outcome of the criminal proceeding.

On April 1, 1992, the Trustee saw fit to submit an unsolicited Reply Memorandum, in addition to the authorized materials, all of which were timely filed on March 20, 1992. *But see In re Jungkurth*, 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.*, 87 B.R. 333 (E.D.Pa.1988) (unsolicited supplemental submissions are inappropriate).

The factual record is developed in the Joint Stipulation of Agreed Facts. The Debtor and Local 30 were parties to a collective bargaining agreement ("the Local 30 Agreement"), covering the time period from May 1, 1989, to April 30, 1993. Under the Local 30 Agreement, the Debtor was required to deduct from its employees' wages certain specified amounts formulated according to the "Roofers Local $30 Hourly Wage, Deductions, & Contribution Schedule" ("the Schedule") for Local 30's Vacation Fund, its PA Fund, its HA Fund, and the Union Fund.

Under Article XXVIII of the Local 30 Agreement, the Debtor was required to deduct specific amounts from the employees' wages for the Vacation Fund. Such monies were to be sent to the Administrator of the Vacation Fund along with any reporting forms consistent with rules and regulations issued by the Vacation Fund Trustee. The Vacation Fund Agreement and Declaration of Trust were considered incorporated into the Local 30 Agreement and binding upon the Debtor. Further, by virtue of the Debtor's signing the Local 30 Agreement, the Debtor agreed to "adopt and be bound by the existing Agreement and Declaration of Trust, together with amendments thereto, establishing the [Local 30] Vacation Fund."

Under Article XXXI of the Local 30 Agreement, the Debtor was required to make weekly deductions from the wages of any journeyman and/or apprentice who submitted a written authorization for same to the Union Fund. The deductions, representing "dues or service charges," were payable to the Union and required to be sent to the Union Depositary. Additionally, the HA Fund deductions were also to be sent to the Union. Article XXXIII of the Local 30 Agreement required the Employer, upon receipt of a voluntary, revocable authorization from an employee, to make specified deductions from that employee's wages and send them monthly to the PA Fund. The deductions were said to be "constituted as a segregated fund and be otherwise organized and administered in such manner as to comply with applicable federal law governing the said activities and disbursement of such funds."

Set forth in a separate article of the Local 30 Agreement, Article XXXIV, are provisions regarding the "Payment of Contributions and Filing of Reports" for the various Local 30 Funds. Pursuant to Section 2(b) of Article XXXIV for payment of delinquent Local 30 Fund payments, the Debtor was required to pay

[i]nterest at the rate of 1% per month shall be due on all payments made after the twenty-fifth (25th) days of the month following the month for which they are due. The Employer who is delinquent in such fashion shall pay counsel fees and liquidated damages up to 15% of the amount of delinquent contributions to the various benefit funds in the event such funds find it necessary to initiate legal action to recover the delinquency.

Under Section 2(d) of that Article, the Debtor was also required to place in escrow with the Depositary of Funds money, or a bond issued by a carrier acceptable to the various Fund Trustees. Placement of the money or bond in escrow was to guarantee payments of the Funds' contributions. From the evidence before the court, it is unclear whether the Debtor placed money or a bond into escrow, or whether an escrow was even established. Furthermore, under Section 2(g) of Article XXXIV, the Debtor was required to permit the various Local 30 Fund Trustees to examine its books and records in order to insure that the appropriate contributions were made for journeymen and apprentices. The record does not reveal whether any such examinations were ever attempted or made, or what the results of same, if any, were.

The Local 30 Fund Agreement and Declaration of Trust also covered the Vacation Fund ("the Local 30 Vacation Agreement"). The parties to this document are the Roofing and Sheet Metal Contractors' Association of Philadelphia and Vicinity ("the Association") and Local 30. As outlined in the Local 30 Agreement, the Vacation Fund was derived from employee wage deductions made by employers who sent them to the Administrators of the Vacation Fund. The Administrators of the Vacation Fund are six-member board of trustees, three of whom were appointed by the Association and three of whom were appointed by the Union. The specific delineated duties of the trustees are:

... tak[ing] such steps, including the institution and prosecution of, or the intervention in, any proceedings of law, in equity, or in bankruptcy as may be nec-essary or desirable to collect Employer contributions which have been deducted from employees' wages but not transmitted.

... deposit[ing] all monies received by it in such banks or such depositories as are federally insured as it may designate for that purpose, and may, in its sole discretion, invest and reinvest such funds as it does not require for current expenditures.

... hav[ing] the power to compromise, settle, arbitrate and release claims or demands in favor of or against the [Local 30 Vacation] Fund or the trustees on such terms and conditions as the trustees may deem advisable.

... hav[ing] the power to construe the provisions of [the Local 30 Vacation Agreement] and the terms used herein and any such constructions adopted by the trusteed in good faith shall be finding upon the Union [Local 30] ... [and] the Association....

More generally, the Local 30 Vacation Agreement sets forth how the trustees should utilize the Vacation Fund, describes the trustees' authorized powers and immunities, and addresses several other issues.

The parties also stipulated that, in addition to being a party to the Local 30 Agreement, the Debtor was also party to a collective bargaining agreement ("the 30B Agreement") with the Residential Reroofing Local 30B of the United Union of Roofers, Waterproofers and Allied Workers, AFL–CIO ("Local 30B") (collectively Local 30 and Local 30B are referenced as "the Unions") to make contributions to the Local 30B Vacation Fund ("the 30B Vacation Fund"), the Local 30B Political Action Fund ("the 30B PA Fund"), and the Local 30B Union Fund ("the 30B Union Fund") (collectively, the Local 30 Funds and the Local 30B Funds are referenced as "the Funds"). Like the Local 30 Funds, the Local 30B Funds were derived from employee wage deductions. Of the three funds, only the Local 30B Vacation Fund is discussed in the 30B Agreement.

Pursuant to Article XXII of the 30B Agreement, the Debtor, upon receipt of a

written authorization from an employee, was required to deduct

[f]ifty-eight cents ... per hour for each hour worked from the wages of each employee and submit the same to the Administrator of the Vacation Fund monthly at the time and the manner set forth with respect to Health and Welfare and Pension fund contributions.

The Debtor, as with the Vacation Fund, became a party to the Agreement and Declaration of Trust for the 30B Vacation Fund upon signing the 30B Agreement. The Debtor was required to make payments, on a monthly basis, to the 30B Vacation Fund and to file a form (whose format must have been agreed upon by the trustees for the 30B Vacation Fund) containing the names of those persons (and any other pertinent information as required) contributing to the 30B Vacation Fund. The trustees were designated by Local 30B and the Roofing Metal and Heating Associates, Inc. to administer the 30B Vacation Fund and were authorized to represent the Debtor and the employees in the administration of the 30B Vacation Fund.

The Debtor failed to remit the monies deducted from employee wages for any of the Funds from the period from January, 1990, through March, 1990; and from November, 1991, through February, 1991. The monies deducted and not remitted to the Local 30 Funds were as follows:

(1) $20,298.18 (Vacation Fund);

(2) $1,542.59 (PA Fund);

(3) $858.57 (HA Fund); and

(4) $20,779.53 (Union Fund).

The Debtor failed to remit the following amounts, which had been deducted from employee wages for the period January, 1990, through March, 1990; and November, 1990, through January, 1991, to the Local 30B Funds:

(1) $735.55 (30B Vacation Fund);

(2) $57.20 (30B PA Fund); and

(3) $607.10 (30B Union Fund).

The parties have stipulated that the Debtor failed to segregate the monies deducted from employee wages for the Local 30 Funds and Local 30B Funds.

The parties have also stipulated that the Trustee shall pay forthwith all sums due to the Funds which became payable after November 30, 1990, which are as follows:

(1) $768.30 (Vacation Fund);

(2) $50.40 (PA Fund);

(3) $29.56 (HA Fund);

(4) $717.92 (Union Fund);

(5) $99.24 (30B VA Fund);

(6) $7.85 (30B PA Fund); and

(7) $81.90 (30B Union Fund).

The parties also stipulated that, as of the date that the Debtor filed bankruptcy on April 5, 1990, the Debtor had $1,397.00 cash on hand, $3,702.50 in deposits, and $881,449.35 accounts receivable. When the case was converted to Chapter 7 on November 30, 1990, they agreed that the Debtor had $446.20 cash on hand, $13,780.50 in deposits, and $513,268.62 accounts receivables. The Stipulation also provides that the Debtor "failed to maintain and keep separate accounts of the monies it deducted from its employees' wages for transmittal to" the Funds. No other evidence of tracing of any specific funds in the Trustee's hands to any particular source appears of record.

## C. DISCUSSION

### 1. THE UNIONS ARE REQUIRED TO OVERCOME A STRONG BANKRUPTCY POLICY OF NOT ALLOWING A CLAIM THAT THE ALLEGED EXISTENCE OF A "TRUST FUND" OVERCOMES EQUALITY OF DISTRIBUTION AMONG CREDITORS.

■ In *In re American Int'l Airways, Inc.*, 70 B.R. 102, 103 (Bankr.E.D.Pa.1987) (*"AIA II"*), in response to the assertion of the Internal Revenue Service ("the IRS") that a deposit of funds in a trust account entitled it alone to receive the funds, this court expressed an "aversion to giving particular creditors any sort of preference in a bankruptcy distribution." We did, however, ultimately conclude that

a combination of a specific legislative intent to render such federal tax trusts separate and apart from the property of

the Debtor's estate and the strict performance by the Debtor and the Trustee of their duties as trustee of the funds requires a finding in favor of the federal government.

*Id.*

We frequently reiterated this theme in later cases, making clear that "we are not inclined to allow creditors to utilize a trust theory as a means of obtaining preferential treatment in a bankruptcy." *In re Temp–Way Corp.*, 82 B.R. 747, 753 (Bankr. E.D.Pa.1988). *See In re Miller's Auto Supplies, Inc.*, 93 B.R. 344 (Bankr.E.D.Pa. 1988) (*"Miller II"*), *reinstating In re Miller's Auto Supplies, Inc.*, 75 B.R. 676 (Bankr.E.D.Pa.1987) (*"Miller I"*), *vacated & remanded*, 93 B.R. 342 (E.D.Pa.1988); and *In re American Int'l Airways, Inc.*, 83 B.R. 324, 329 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–3529 (E.D.Pa. August 15, 1988), *rev'd*, 878 F.2d 762 (3d Cir.1989), *aff'd sub nom. Begier, supra* (*"AIA III"*). *Accord, e.g., In re Auto Train Corp.*, 810 F.2d 270, 274 (D.C.Cir.1987); and *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1420 (9th Cir.1985).

Of course, we recognize that *Begier* reversed *AIA III*. However, it must be recalled that *Begier/AIA III*, like *Miller*, was a case seeking to avoid as preferential a payment on "trust fund taxes" which had already been made by the debtor pre-petition. We note that, in *Begier*, the Court was careful to confine its holding to a case involving specific provisions of the IRC and did not overrule or even disapprove of cases like *Miller*, which did not relate to these specific provisions.

In *Begier*, the Court began with recitation of the principle recited in *AIA II:*

Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property. *See, e.g.,* 11 U.S.C. § 726(b) (1982 ed.); H.R.Rep. No. 95–585, *supra*, at 177–178 [ (1977) ].

110 S.Ct. at 2262–63.

The Court went on to find, however, that Congress established that "a special fund

in trust for the United States" was created as to employers obliged to withhold federal taxes from their employees on the basis of 26 U.S.C. § 7501(a). *Id.* at 2263.

Next, the Court reasoned that legislative history pertinent to enactment of the Bankruptcy Code expressed an intention to overrule the holding of *United States v. Randall*, 401 U.S. 513, 517, 91 S.Ct. 991, 994, 28 L.Ed.2d 273 (1971), that the IRS had no priority over other creditors simply because the debtor had on hand general funds sufficient to satisfy its trust-fund tax obligations. *Id.* at 2265–67. It then held that the same legislative history supported the conclusions that the debtor's voluntary payment of trust-fund obligations was sufficient to "establish the required nexus between the 'amount' held in trust and the funds paid," such as to preclude the trustee's recovery of the funds paid to the IRS as preferences. *Id.* at 2267.

The *Begier* holding was therefore dependent upon the coalescence of several factors totally absent from the instant factual matrix. Firstly, there was a federal statute which expressly declared that the withholding taxes in issue were held in a trust fund for the benefit of the IRS. Secondly, the Code relied heavily upon legislative history which established that withholding tax payments were *not* to be considered preferential and were to be considered to be held in trust for the IRS, as long as the debtor ultimately made the tax payments. Thirdly, the act of payment was found to be necessary to establish the *res* of the trust. Fourthly, the Court reiterated its holding in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2314 n. 10, 76 L.Ed.2d 515 (1983), that the "IRS cannot exclude funds from the estate *if it cannot trace them to § 7501 trust property.*" *Id.* at 2266 (emphasis added).

In the instant factual setting, as will be demonstrated *infra*, there is no federal statute which so clearly provides that funds withheld are to be deemed held in trust. There is no legislative history which supports special treatment of union trust-fund obligations. More importantly, the

Debtor has never made the payments in issue to the Funds, eliminating the argument that the *res* of a potential trust exists. And, finally, the Funds offer no evidence of tracing, which the Court suggests and other courts have held would be necessary even in the case of federal "trust-fund" taxes where payment was made, as is not the case here. *See* pages 142–43 *infra.*

Therefore, the implication is clear that the "ordinary" rule of "equality of distribution" must prevail. We hold that *Begier* supports rather than undermines the rule that a creditor's claim that it is the beneficiary of a trust created by the debtor on its behalf will be viewed with disfavor, and will be allowed to prevail as an exception only in the narrowest of circumstances, where a strong contrary federal governmental policy is at stake. We therefore conclude that the Unions' claim that their interests are protected by a trust is not one that has generally been successful and cannot succeed in the absence of extraordinary circumstances which do not appear to be present here.

2. THE UNIONS ARE UNABLE TO ESTABLISH THE STATUS OF BENEFICIARIES OF TRUSTS ENTITLED TO PRIORITY OF DISTRIBUTION.

a. *A Summary of The Unions' Arguments*

The Unions present coherent (although ultimately unpersuasive) arguments as to why each of their particular Funds should nevertheless be accorded "special treatment." As to the Union Funds and the HA Funds, they point to language in employees' checkoff cards which states that the employer holds the funds "as Trustee for the Union." As to the Vacation Funds, the Unions emphasize language in the Agreements and in the Labor Management Relations Act, 1947, ("ERISA"), 29 U.S.C. § 186(c)(5), which provides that such plans constitute a "trust" relationship. As to the PA Funds, the Unions argue that a constructive trust is created because the checkoffs provide that monies are to be deducted for the specific purpose of creating the PA Funds.

As to tracing, the Unions claim that tracing is unnecessary to support their rights under the express trusts allegedly established as to all but the PA Funds. In the alternative, and as to the PA Funds, they argue that the "lowest balance theory" should be utilized to preserve, to their exclusive benefit, the $446.20 cash and $13,780.50 in deposits which the Debtor's estate had on hand at the time of conversion of this case to Chapter 7. Furthermore, they contend that "reasonable assumptions" should be employed to trace funds payable to them into the Debtor's accounts receivable.

None of these contentions override the force of the principles established in *Begier, AIA II,* and cases such as *Miller.* Furthermore, each of these arguments has its own particular weaknesses as well.

b. *The Elements of an "Express Trust"*

The Unions argue that, under presumably-controlling Pennsylvania law, the Funds are, in most cases, created as express trusts or, at least in the alternative, are constructive trusts. Under Pennsylvania law, an express trust denotes a trust in the general sense, as opposed to a distinction among the various types of trusts, *i.e.,* resulting trusts, constructive trusts, and trusts imposed by the operation of law. *Sherwin v. Oil City National Bank,* 18 F.R.D. 188, 192 (W.D.Pa.1955) ("*Sherwin I*"), *aff'd,* 229 F.2d 835 (3d Cir.1956) ("*Sherwin II*"). The elements of an express trust, as developed by Pennsylvania case law, are (1) an express intent to create a trust; (2) an ascertainable *res;* (3) a sufficiently certain beneficiary; and (4) a trustee who "owns" and administers the *res* for the benefit of another (the beneficiary). *See In re Penn Central Transportation Co.,* 486 F.2d 519, 524 (3d Cir.1973), *cert. denied sub nom. Baker v. Indiana H.B. R.R.,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) ("*Penn Central I*"); *Sherwin II, supra,* 229 F.2d at 838, 839; *In re I.D. Craig Service Corp.,* 125 B.R. 453, 456 (Bankr.W.D.Pa.1991); *In re CS Associ-*

*ates,* 121 B.R. 942, 959 (Bankr.E.D.Pa. 1990); *In re Shervin,* 112 B.R. 724, 734 (Bankr.E.D.Pa.1990); and *Presbytery of Beaver–Butler United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 268–69, 489 A.2d 1317, 1324, *cert. denied,* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). Although the absence of *any* of the express trust elements to be present is fatal to the contention that a trust exists, *CS Associates, supra,* 121 B.R. at 959, Pennsylvania federal and state case law has recognized the primary importance of one of the elements: the express intent to create a trust. *See Penn Central I,* 486 F.2d at 574 (the manifestation of the intention to create a trust by the parties involved is controlling); *Eckell v. Borbidge,* 114 B.R. 63, 67 (E.D.Pa. 1990) (the intention of the parties controls, whether indicated by words or by "other objective manifestations of intent, such as the facts and circumstances surrounding the transaction and the relationship of the parties"); *Presbytery of Beaver–Butler, supra,* 507 Pa. at 269, 489 A.2d at 1324; and *Gray v. Liebert,* 357 Pa. 130, 133, 53 A.2d 132, 135 (1947) (an express trust is created only if an intent to create it is manifested, whether by words or by conduct).

■ When the language of the parties fails to indicate the existence of an express trust, the court must then turn to the facts and circumstances surrounding the transaction and the parties' relationship to determine whether a trust exists. *See Penn Central I, supra,* 486 F.2d at 524; and *Eckell, supra,* 114 B.R. at 67. A factor commonly recognized as negating the presence of an express trust is the commingling of monies or assets purportedly comprising the *res. Penn Central I, supra,* 486 F.2d at 524, *In re Delaware & H. Ry.,* 127 B.R. 756, 757 (D.Del.1991); *Eckell, supra,* 114 B.R. at 67; *In re Penn Central Transportation Co.,* 392 F.Supp. 960, 962 (E.D.Pa. 1975) ("*Penn Central II*"); and *Shervin, supra,* 112 B.R. at 734. In the absence of a finding of a trust relationship, a debtor-creditor relationship is often said to exist. *Penn Central I, supra,* 486 F.2d at 524;

*Delaware, supra,* 127 B.R. at 75; and *Shervin, supra,* 112 B.R. at 734.

■ The incompatibility of commingling of funds and a trust relationship flows from the general precept that a trustee, though its legal owner, administers the trust's *res* according to the terms of the trust for the benefit of another and, hence, does not use the *res* for the trustee's own purposes. *Sherwin II, supra,* 229 F.2d at 838; *Penn Central II, supra,* 392 F.Supp. at 962; and *Shervin, supra,* 112 B.R. at 734. Also, although not expressly stated in the case law, inherent in the definition of an express trust is the presence of a fiduciary relationship between the trustee and the beneficiary of the trust. *See Penn Central I,* 486 F.2d at 524; *Shervin, supra,* 112 B.R. at 734; and *Ramsey v. Ramsey,* 351 Pa. 413, 414, 41 A.2d 559, 560 (1945).

Observing its free use by jurists and laymen, this court, as well as other courts, acknowledges the admonition that the word "trust" is very broad, and that "[n]ot every relationship of trust is a trust relationship in the strict sense." *Brunner v. Edwards,* 337 Pa. 513, 526, 12 A.2d 36, 37 (1940), citing *Vosburgh's Estate,* 279 Pa. 329, 332, 123 A. 813, 815 (1924). A relationship which is purportedly a trust relationship may, in fact, be merely a debtor-creditor relationship. The "trustee" may also be a gratuitous custodian who is under no duty to invest or manage the funds of another within her possession, but who must return or "pay out" funds on that other's demand. *Brunner, supra,* 337 Pa. at 525, 12 A.2d at 37. Or, as this court believes is the case in this controversy, the "trustee" simply may be a party who is under a contractual obligation to withhold funds for the benefit of another to another party and who is merely nominally referenced as a "trustee."

### c. The Elements of a "Constructive Trust"

Pennsylvania case law has long held that a "constructive trust arises where a person who holds title to property subject to an equitable duty to convey it to another on the ground that he would be unjustly en-

riched, if he were to retain it." *Pierro v. Pierro*, 438 Pa. 119, 127, 264 A.2d 692, 696 (1970), citing *Chambers v. Chambers*, 406 Pa. 50, 54, 176 A.2d 673, 675 (1962); and *Gray v. Liebert*, 357 Pa. 130, 135, 53 A.2d 132, 135 (1947). *See also Morris v. Philadelphia Electric Co.*, 45 B.R. 350, 353 (E.D.Pa.1984); *In re Lewis Jones, Inc.*, 362 F.Supp. 919, 921 (E.D.Pa.1973), *aff'd*, 492 F.2d 1238 (3d Cir.1974); *Murphy v. Landsburg*, 58 F.R.D. 165, 170 (E.D.Pa.), *aff'd*, 490 F.2d 319 (3d Cir.1973); *In re American Int'l Airways, Inc.*, 44 B.R. 143, 146 (Bankr.E.D.Pa.1984) ("*AIA I*"); *Balazick v. Ireton*, 518 Pa. 127, 134–35, 541 A.2d 1130, 1133 (1988); *Buchanan v. Brentwood Federal Savings & Loan Ass'n*, 457 Pa. 135, 150, 320 A.2d 117, 126 (1974); and *Kimball v. Barr Township*, 249 Pa.Super. 420, 424, 378 A.2d 366, 368 (1977).

A constructive trust is the vehicle through which equity remedies situations where " 'property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, [and therefore] equity converts him into a trustee.' " *Pierro, supra*, 438 Pa. at 127, 264 A.2d at 696, quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380 (1919) (CARDOZO, J.). Because of its roots in equity, the specter of a constructive trust arises where there is a finding that a party, against whom the trust is imposed, acquires property in a manner which " 'creates [an] equitable duty in favor of the party' seeking the constructive trust." *Morris, supra*, 45 B.R. at 352. *See also Balazick, supra*, 518 Pa. at 134–35, 541 A.2d at 1133.

There are no rigid standards for the imposition of constructive trusts. Traditionally, constructive trusts have been imposed where a party acquires legal title to property by violating some express or implied duty owed to another. *Pierro, supra*, 438 Pa. at 127; 264 A.2d at 696. *See also Balazick, supra*, 518 Pa. at 135, 541 A.2d at 1133. Such a trust may also be imposed where property is obtained through bad faith, fraud, or lack of good conscience. *I.D. Craig, supra*, 125 B.R. at 456; *In re*

*Summit Airlines, Inc.*, 94 B.R. 367, 370 (Bankr.E.D.Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa.1989), citing *Kohr v. Kohr*, 271 Pa.Super. 321, 328–29, 413 A.2d 687, 690–91 (1979); *Balazick, supra*, 518 Pa. at 134–35, 541 A.2d at 1133; and *Pierro, supra*, 438 Pa. at 127–28, 264 A.2d at 696.

Constructive trusts have also been imposed in the absence of wrongful conduct, or intentions, in order to prevent unjust enrichment. *See American Trade Partners, L.P. v. A-1 Int'l Importing Enterprises, Ltd.*, 755 F.Supp. 1292, 1301 (E.D.Pa.1990); *AIA I, supra*, 44 B.R. at 146; *Stauffer v. Stauffer*, 465 Pa. 558, 568, 351 A.2d 236, 2141 (1976); *Buchanan, supra*, 457 Pa. at 151, 320 A.2d at 126; and *Kimball, supra*, 249 Pa.Super. at 424–25, 378 A.2d at 368–69. Where a constructive trust is imposed, the "trustee" of the constructive trust (the party against whom the remedy is enforced) must "convey the property or the proceeds to the parties at whose expense the trustee ... was unjustly enriched." *Voest–Alpine Trading USA v. Vantage Steel Corp.*, 919 F.2d 206, 217 (3d Cir.1990).

*d. The Unions have not Proven the Presence of Either Express or Constructive Trusts as to any of the Funds in Issue.*

We find insufficient evidence that an express trust relationship, as opposed to a contractual relationship, existed between the parties, since there were no indications that true fiduciary responsibilities were imposed or assumed, or were intended to be imposed or assumed.

"[I]n order for a debt to arise from a default in a fiduciary capacity, the fiduciary duty must be owed directly to the complaining creditors." *In re Schultz*, 46 B.R. 880, 888 (Bankr.D.Nev.1985). A comparison of the Unions' Vacation and PA Funds and the other Funds reveals that the argument that the Debtor agreed to hold the deducted wage amounts in trust for these Funds is the strongest. The Debtor was under a contractual obligation to remit the monies to the various parties responsible for administration of the Vacation and

the PA Funds. However, the Debtor also arguably assumed the fiduciary role as trustee for the deducted monies until they reached the appropriate parties as to all employees who wished to have monies deducted from their wages and who signed an authorization or check-off cards.

Although the language of the checkoff cards appears to state that the Debtor holds the monies as trustee, this language is not dispositive of the existence of a true trust relationship. Given the nature of what the Debtor did with the monies, there is no indication of an expectation that the Debtor was to assume the fiduciary duties and responsibilities of a trustee. Just because it deducted monies from its employees' wages does not rise the Debtor to the level of a party exercising discretion in the administration or the investment of the trust funds, as is usually done by a trustee. Furthermore, the provisions calling for the payment of interest, liquidated damages, and counsel fees for failure to remit requisite monies for the Local 30 Funds, as well as payment of counsel fees should the Local 30B Fund trustees sue the Debtor for failure to remit monies for the Local 30B Funds, see pages 135–36 supra, sound more in the nature of contractual remedies than remedies normally exercised against a trustee. This court is averse to putting form over substance where trusts are involved. For this reason, it is reluctant to find that the language in the check-off cards, see page 139 supra, imposes the fiduciary strictures of an express trust.

As to the presence of constructive trusts, the Unions contend that grounds for such a finding could be based upon the argument that, once the Debtor deducted the monies from the employee wages, it had an equitable duty to remit them to the appropriate sources. However, there are no facts supporting the imposition of a constructive trust on the grounds that the Debtor obtained the funds through bad faith, fraud, lack of good conscience, or wrongful conduct. In the framework of bankruptcy proceedings, bankruptcy courts have imposed constructive trusts in order to prevent unjust enrichment. See I.D. Craig, supra, 125 B.R. at 456; and AIA I, supra, 44 B.R.

at 146. However, this court has rarely imposed such constructive trusts, because it has recognized that constructive trusts are viewed "as tantamount to giving preference to particular creditors in bankruptcy distribution, and ... that their recognition should be sparingly legitimized." In re Temp–Way Corp., 80 B.R. 699, 704 (1987), citing Miller I, 75 B.R. at 679. This position is consistent with earlier cases in this district holding that

> [i]n a bankruptcy proceeding a constructive trust will not be declared simply because a debtor is avoiding part of his obligations to his creditors. That is the necessary outcome of all successful bankruptcy proceedings. In rejecting a creditor's argument seeking the imposition of a constructive trust, the court in In re Lewis Jones [362 F.Supp. 919 (E.D.Pa.1973)].... observed that the debtor in these proceedings was [not] any more "unjustly enriched" than any debtor in any Chapter XI proceeding who has not paid its creditors, and for that reason the funds should not be impressed with a constructive trust.

Morris, supra, 45 B.R. at 353–54. For this reason, and because there are not indicia of the requisite conduct evincing unjust enrichment, this court cannot find that a constructive trust should be imposed.

■■■ The party seeking a constructive trust carries the burden of proving the facts warranting its imposition. Morris, supra, 45 B.R. at 353; In re McKay, 110 B.R. 764, 770 (Bankr.W.D.Pa.1990); and AIA I, supra, 44 B.R. at 146. We find that this burden has not been met by the Unions.

e. *The Unions are Unable to Trace any of the Disputed Funds in the Hands of the Debtor to the Funds, Thus Eliminating Their Claim to a Priority in These Sums.*

An important prerequisite for the imposition of a constructive trust is an identifiable *res.* See In re Penn Central Transportation Co., 333 F.Supp. 77, 81 (E.D.Pa. 1971). There is no indication that the Unions required, or that there actually was,

segregation of the trust-fund monies. Thus, it is impossible to trace the amounts representing any purported trust *res.*

As we indicated at pages 138–39 *supra,* we believe that *Begier,* especially in its reference to *Whiting Pools,* held that tracing is required if a trust beneficiary is to make any valid claim to the proceeds of an identifiable trust *res. See also In re Leedy Mortgage Co.,* 111 B.R. 488, 494 (Bankr. E.D.Pa.1990).

Thus, this court finds that, even if a trust relationship between the Debtor and the Funds could be found, the Unions' inability to trace the employee wage deductions forecloses a finding that the particular sums in the hands of the Trustee are the *res* of any trust.

We disagree with the Unions' contention that *In re California Trade Technical Schools, Inc.,* 923 F.2d 641, 647 (9th Cir. 1991); and *In re First Capital Mortgage Loan Corp.,* 872 F.2d 335, 336–37 (10th Cir.1989), stand for the principle that tracing is not required to sustain the Unions' rights to the Funds in the event that we found that there was an express trust. Rather, in those cases, the respective trustees restored and replaced, respectively, funds to trusts which had previously been improperly removed therefrom. The courts merely held that such restored and replaced funds need not be traced to remain the *res* of the trusts. We again reiterate that, in both *Begier* and *Whiting Pools,* the Court makes clear that tracing is generally required as to any alleged trust.

This principle was recently reemphasized in *Goldberg v. New Jersey Lawyers' Fund for Client Protection,* 932 F.2d 273, 280 (3d Cir.1991). *Goldberg* involved an attorney who was disbarred from the practice of law for improperly withdrawing funds from his Attorney *Trust* Account. Although the court appeared to conclude that the funds held in the Account were subject to an express trust, *id.* at 274, it holds that

[i]n order to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) *identify and trace the trust funds if they are commingled.*

*Id.* at 280 (emphasis added).

We also reject the Unions' argument that the "lowest balance theory," as articulated in *In re Mahan & Rowsey, Inc.,* 817 F.2d 682, 684–85 (10th Cir.1987), can be successfully applied here. It was not proven that *any* of the funds in the Trustee's possession were, at *any* time, traceable to employee wage deductions. Therefore, as in *In re Hurricane Elkhorn Coal Co. II,* 19 B.R. 609, 613–14 (Bankr.W.D.Ky.1982), the application of this theory must be rejected.

Finally, the alleged "reasonable assumption" in which the Unions ask us to indulge is that the "[D]ebtor had the trust assets 'on hand' at the commencement of the case—having implicitly exchanged cash for the pledge of notes (accounts receivable)." These circumstances are quite distinct from those in issue in *Summit Airlines, supra,* 94 B.R. at 371–72; and *In re E & S Comfort, Inc.,* 92 B.R. 616, 622 (Bankr.E.D.Pa. 1988), where we found that tracing could be aided by "reasonable assumptions." In *Summit Airlines,* a prospective purchaser of aircraft deposited funds into an escrow account for repairs to an aircraft and the payments for repairs were in fact made. 94 B.R. at 372. In *E & S Comfort,* we applied "reasonable assumptions" to conclude that all deposits into a special account earmarked for taxes, but which included a few additional payments, were tax-fund payments. 92 B.R. at 622.

The instant case, meanwhile, presents a situation where the Debtor completely failed to maintain separate accounts for the Funds in issue and therefore clearly commingled all of its funds. "Reasonable assumptions" do not aid the Unions in establishing the creation of a trust *res* in such circumstances. *Compare Summit Airlines,* 94 B.R. at 372–73 ("reasonable assumptions" do not establish an earmarking of escrow funds for legal expenses when payments are made for "expenses" of debtor generally).

The Unions' arguments with respect to the Vacation and PA Funds are fainter than those concerning the Union and HA

Funds, as there was no alleged contractual assumption of a nominal "trustee" role by the Debtor with respect to the Union and HA Funds. Nor is there any indication of the sort of inequitable conduct on the part of the Debtor as would justify the imposition of constructive trusts as to these Funds.

Perhaps realizing this, the Unions turned to statutory provisions in ERISA which include "trust language" to attempt to bolster its arguments with respect to the Vacation Funds. Concededly, the trustee did agree in the Joint Stipulation of Agreed Facts, that the Vacation Funds are "employee welfare benefit funds," deductions for which are referred to as "trusts" in ERISA as well as in the parties' Agreements. However, as the *Begier* decision establishes, just because legislation refers to an obligation as a "trust," and to the obligor as a "trustee," does not mean that the Debtor's deduction of the appropriate wages makes it a fiduciary, or results in its acquisition of fiduciary duties and responsibilities.

In *Nazay v. Miller*, 949 F.2d 1323, 1329 (3d Cir.1991), speaking of the fiduciary duties of employers under ERISA, the court states that

> [t]o secure the proper administration of benefit plans, ERISA imposes a heightened standard of care on fiduciaries, who must "discharge [their] duties with respect to a plan solely in the interest of the participants an the beneficiaries and for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) ... "ERISA permits employers to wear 'two hats' and ... they assume fiduciary status 'only when and to the extent' that they functions in their capacity as plan administrators...". *Belade v. ITT Corp.*, 909 F.2d 736, 738 (2d Cir.1990) (per curiam) (*quoting Amato v. Western Union International*, 773 F.2d 1402, 1416–17 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986)).

As is stated in 29 U.S.C. § 1002(21)(A) of ERISA, an employer is considered a fiduciary only to the extent that it exercises discretion or control in the administration of a plan or how the assets of the plan are invested. *Nazay, supra*, 949 F.2d at 1329 n. 8. *See also Adams v. LTV Steel Mining Co.*, 936 F.2d 368, 370 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 968, 117 L.Ed.2d 134 (1992); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990); and *Kreml v. Diamond Shamrock Corp.*, 701 F.Supp. 1400, 1405 n. 2 (N.D.Ill. 1988). Nowhere is it established that fiduciary duties and responsibilities consistent with § 1002(21)(A) were imposed upon the Debtor. Nor does the Local 30 Vacation Agreement impose such duties or responsibilities on the Debtor. Rather, that Agreement provides that these type of duties and responsibilities reside in the six-member trustee board, of which the Debtor is not a member. Hence, under ERISA, the Debtor did not assume the role of a trustee of the Vacation Funds.

Having failed to establish rights as beneficiaries of trusts as to the other Funds, the Unions, as to the PA funds, are patently unable to establish such rights solely under a weak constructive trust theory.

Therefore, we conclude that, apart from the fact that the Unions are unable to establish that the Funds are entitled to "special treatment" in contradiction to *Begier*, *AIA II*, and *Miller*, as well as *Goldberg, supra*, 932 F.2d at 280, the Unions are unable to establish rights superior to other creditors as purported beneficiaries of trustee under applicable state and non-bankruptcy federal law.

## D. CONCLUSION

For all of the reasons stated herein, we conclude that Unions are able to recover only the sums stipulated to be due to the respective Funds as a result of the Trustee's nonpayment after conversion of the case on November 30, 1990. We will so order.